**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **(1) THE STATE OF OKLAHOMA,** <br> **E. Scott Pruitt** <br> Attorney General <br><br> **and** <br><br> **(2) DOMESTIC ENERGY PRODUCERS ALLIANCE,** <br><br> **Plaintiffs,** <br> v. <br><br> **(1) DEPARTMENT OF THE INTERIOR,** <br><br> **(2) SALLY JEWELL**, in her official capacity as Secretary, U.S. Department of the Interior, <br><br> **(3) FISH & WILDLIFE SERVICE**, a part of the Department of the Interior, <br><br> **(4) DANIEL M. ASHE**, in his official capacity as Director of the Fish & Wildlife Service, U.S. Department of the Interior, <br><br> **(5) GARY FRAZER**, in his official capacity as Assistant Director for Endangered Species at the Fish and Wildlife Service, U.S. Department of the Interior, and <br><br> **(6) DIXIE PORTER**, in her official capacity as the Field Supervisor, Oklahoma Ecological Services Field Office, Fish & Wildlife Service, Tulsa, OK, <br><br> **Defendants.** | **No. 14-CV-123-TCK-PJC** <br><br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................. 2

JURISDICTION AND VENUE ....................................................................... 6

THE PARTIES .................................................................................................. 7

LEGAL FRAMEWORK .................................................................................. 9

    THE ENDANGERED SPECIES ACT ...................................................................... 9

    THE ESA'S LISTING PROCEDURES ................................................................... 10

    CANDIDATE SPECIES ....................................................................................... 14

    VOLUNTARY CONSERVATION MEASURES ........................................................ 16

PROCEDURAL & FACTUAL BACKGROUND ....................................... 18

    SETTLEMENTS FOR CANDIDATE SPECIES ........................................................ 18

    THE OKLAHOMA SPECIES ............................................................................... 24

    A.  THE RABBITSFOOT MUSSEL ................................................................. 25

    B.  THE LESSER PRAIRIE-CHICKEN ........................................................... 27

    C.  THE SPRAGUE'S PIPIT .......................................................................... 30

    D.  THE ARKANSAS DARTER ...................................................................... 32

CLAIMS FOR RELIEF ................................................................................. 32

    COUNT I VIOLATION OF THE APA AND ESA: ELIMINATION OF THE ESA'S
    "WARRANTED BUT PRECLUDED" ALTERNATIVE ............................................. 32

    COUNT II VIOLATION OF THE APA AND ESA:  FAILURE TO CONSIDER BEST SCIENTIFIC
    AND COMMERCIAL DATA AND CONSERVATION PRACTICES ............................. 34

    COUNT III VIOLATION OF THE APA AND ESA:   FAILURE TO COMPLY WITH ESA
    SECTION 4(H) GUIDELINES ............................................................................. 36

    COUNT IV VIOLATION OF THE APA: RULEMAKING WITHOUT THE REQUISITE LEGAL
    PROCESS ........................................................................................................ 37

    COUNT V VIOLATION OF THE DUE PROCESS CLAUSE OF  THE FIFTH AMENDMENT TO
    THE UNITED STATES CONSTITUTION ............................................................... 39

    COUNT VI VIOLATION OF ARTICLE II OF THE UNITED STATES CONSTITUTION ........... 42

PRAYER FOR RELIEF ................................................................................. 43

**COMPLAINT FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.     Plaintiff the State of Oklahoma (the "State"), and Plaintiff the Domestic Energy Producers Alliance ("DEPA")  bring this action against the Fish & Wildlife Service ("FWS") seeking declaratory and injunctive relief for violations of the Endangered Species Act ("ESA"), the Administrative Procedure Act ("APA"), and the United States Constitution.   Plaintiffs have also submitted a Notice of Intent to Sue, pursuant to 16 U.S.C. § 1540(g), to FWS for violations of the ESA.  In the instant suit, Plaintiffs seek relief from FWS's violations under the APA for FWS's actions that are contrary to the ESA and the APA, and for FWS's violation of the Constitution.

2.     This action seeks to address an agency's efforts to alter its legal obligations in the absence of Congressional action or a public rulemaking.  By entering into private settlements with special interest litigants, FWS has attempted to circumvent the legislative and regulatory process and make fundamental changes to its ESA-imposed obligations.  Having been deprived of an opportunity to participate in shaping the substantive policy choices embedded in FWS's settlements, the State and DEPA members suffer injury from FWS's implementation of the settlements' provisions in Oklahoma.

3.     Under the ESA, if a species "may" be warranted for listing as endangered or threatened, FWS has the duty to consider classifying such a species as (i) not warranted, (ii) warranted, or (iii) warranted but "precluded" by FWS's obligation of its limited resources to higher priorities.  *See* 16 U.S.C. § 1533(b)(3)(B).  A species receiving the "warranted but precluded" classification is designated as a "candidate species."

4.      The ESA and its regulations mandate for each of these candidate species that, once each year, FWS must consider the same three listing alternatives:  (i) listing as endangered or threatened is "not warranted," (ii) listing is warranted and a listing rule is proposed, or (iii) listing is warranted but precluded because the species at issue has a lower priority as compared to other species.  *See* 16 U.S.C. §§ 1533(b)(3)(B), (b)(3)(C)(i).

5.      The ESA also requires that FWS's listing decisions be grounded on the "best scientific and commercial data available," on state and private "conservation measures," and on science-driven prioritization of the candidate species.  16 U.S.C. §§ 1533(b)(1), (h).

6.      FWS has chosen to eliminate one of these three statutory options.  Specifically, for all the 2010 candidate species, FWS eliminated a continued designation of "warranted but precluded."   Rather than pursuing this change through legislation or rulemaking, FWS chose the expedient of "friendly" settlements of a series of lawsuits brought by like-minded, special interest litigants.

7.      FWS's agreement to forego consideration of continuing a species' classification as "warranted but precluded by higher priorities" prevents voluntary measures from achieving the conservation goals that would remove the need to list a species.  Instead, by committing in the settlements to complete listing decisions for hundreds of species within the span of only a few years, FWS bound itself to make a substantive decision – probably to list the already "warranted" species – before voluntary efforts have been given a chance to remove the threats posed to candidate species.

8.      The unlawful and harmful effects of FWS's settlements are particularly pronounced for species in Oklahoma classified as candidate species, including the Lesser Prairie-Chicken (*Tympanuchus pallidicinctus*), the Sprague's Pipit (*Anthus spragueii*), the Rabbitsfoot

Mussel (*Quadrula cylindrica*), and the Arkansas Darter (*Etheostoma cragini*) (collectively, the "Oklahoma Candidate Species").  Despite conservation efforts undertaken by the State of Oklahoma, other states, DEPA member companies and other industry participants, FWS purports to be compelled by its settlements to make premature decisions in violation of its obligation to rely upon best scientific and commercial data available as to whether these species should be listed under the ESA as threatened or endangered.  (FWS recently listed the Rabbitsfoot Mussel as "threatened" and has committed to making a listing decision for the Lesser Prairie-Chicken on March 31, 2014.)  If these candidate species were assessed pursuant to provisions of the ESA, FWS's implementing regulations, and three decades of practice, then-current science and ongoing conservation efforts (including approved Candidate Conservation Agreements with Assurances ("CCAAs")) might well yield a decision to continue to classify these species as candidate species.

9.      The premature listing of these species has injured and will continue to injure Plaintiffs.  Among other injuries, once these species are listed under the ESA, companies that are DEPA members incur expense to comply with a rule accompanying the listing, to avoid a "take" in violation of the ESA, and/or to obtain incidental take permits under the ESA.  *See* 16 U.S.C. §§ 1538(a), 1539(a).  DEPA members would also be exposed to potential criminal violations under the ESA and its implementing regulations.  *See* 16 U.S.C. § 1540(b).  Finally, DEPA members are denied the benefit of the voluntary conservation measures they have undertaken for some of these species in order to preclude their ESA listing.

10.     In addition, listing any of the Oklahoma Candidate Species will increase the regulatory burden on the State of Oklahoma and will narrow the State's flexibility with regard to regulating habitat within its jurisdiction.  The Rabbitsfoot Mussel's premature listing as

4

"threatened" has already made it more cumbersome for the State to transplant the species among watersheds to help conserve this mussel.  For the Lesser Prairie-Chicken, the State is among five states that have jointly developed the Lesser Prairie-Chicken Range-Wide Conservation Plan[1] ("Range-Wide Plan"), a voluntary conservation program formally endorsed by FWS[2] that is unprecedented in the scope of protection it affords the species and the degree of multi-disciplinary collaboration that underpins the program.

11.     The State and DEPA members expended significant resources and effort in their participation in the Range-Wide Oil & Gas CCAA ("O&G CCAA") for the Lesser Prairie-Chicken, a CCAA tiered to the Range-Wide Plan that FWS approved on February 28, 2014.  FWS's approval of the Range-Wide Plan and, most recently, the O&G CCAA, may create the illusion that FWS is giving these conservation measures a chance to work so as to obviate the need for listing the Lesser Prairie Chicken.  But FWS' approvals have no practical significance.  FWS remains committed to an arbitrary and aggressive listing decision deadline of March 31, 2014 and it is unrealistic to think that substantial commitments of acreage and capital can be made by oil and gas companies and others by that date.   Further, by allowing artificial deadlines to diminish the impact of the Range-Wide Plan and O&G CCAA, FWS undermines support for similar state-led, voluntary conservation programs for other species.

---

[1] LESSER PRAIRIE-CHICKEN INTERSTATE WORKING GROUP, THE LESSER PRAIRIE-CHICKEN RANGE-WIDE CONSERVATION PLAN (William E. Van Pelt ed., Oct. 2013), http://www.wafwa.org/documents/2013LPCRWPfinalfor4drule12092013.pdf (last visited Mar. 17, 2014).

[2] Press Release, U.S. Fish & Wildlife Service, U.S. Fish and Wildlife Service Endorses Western Association of Fish and Wildlife Agencies Lesser Prairie-Chicken Range-Wide Conservation Plan (Oct. 23, 2013), http://www.fws.gov/news/ShowNews.cfm?ID=E6267BFC-E38A-E402-8295AE3A5FD77DF1 (last visited Mar. 17, 2014).

12.     Defendants' actions are unlawful under the ESA and APA, and are actionable under the APA.  First, Defendants have omitted the statutory alternative of retaining these species within the candidate species classification pursuant to science-driven priorities.  Second, Defendants have violated their statutory obligation to make ESA listing decisions "solely on the basis of the best scientific and commercial data available . . . after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State . . . to protect such species [including] conservation practices, within any area under its jurisdiction . . .."  16 U.S.C. § 1533(b)(1)(A).  Third, Defendants have violated their obligation to ensure well-documented, science-driven listing decisions by their failure to adhere to guidelines that establish a priority system for removing species from the candidate species classification.  Fourth, Defendants have adopted substantive, binding policies that conflict with FWS regulations in derogation of the APA and other rulemaking procedures.

13.     Defendants' actions also violate the United States Constitution.  Defendants have violated the due process clause of the Fifth Amendment to the Constitution, as applied to the Oklahoma Candidate Species, in adopting, via settlements without public participation, a substantive, binding rule that eliminates statutory and regulatory rights otherwise available to the Plaintiffs.  By entering into the settlements, Defendants have also abdicated the executive branch's duty under Article II of the Constitution, transferring ESA-related decision-making authority to special interest litigants, thereby, empowering them to supplant the executive branch's implementation of critical provisions of the ESA.

## JURISDICTION AND VENUE

14.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (Federal question jurisdiction) and the APA, 5 U.S.C. § 702 (judicial review of final agency action).  This Court

can grant declaratory and injunctive relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 701-706, for violations of, *inter alia*, the APA, 5 U.S.C. § 706.

15.     Venue is proper in the U.S. District Court for the Northern District of Oklahoma under 28 U.S.C. §§ 1391(c)(2) and (e) in that: (i) Defendant(s) reside in the Northern District of Oklahoma, maintaining an office at  9014 East 21st Street, Tulsa, OK 74129, from which FWS implements FWS policies within the State of Oklahoma, (ii) a substantial part of the events and omissions giving rise to these claims occurred in the Northern District of Oklahoma, and future regulatory impacts of FWS's listing decisions will be felt within this district in that, according to FWS, habitat for the Rabbitsfoot Mussel, the Arkansas Darter, and the Sprague's Pipit is located within the Northern District of Oklahoma; (iii) Plaintiff State of Oklahoma resides, for venue purposes, in all Districts within Oklahoma and thus resides in the Northern District of Oklahoma; and (iv) DEPA and many of DEPA's member companies maintain their respective principal places of business in Oklahoma and conduct business within the Northern District of Oklahoma.

**THE PARTIES**

16.     Plaintiff STATE OF OKLAHOMA has allocated significant resources to the preservation of candidate species and ESA-listed species within its borders.  The State enforces its own endangered species statute and regularly implements programs, such as the Lesser Prairie-Chicken Habitat Conservation Program and the Wildlife Habitat Improvement Program to aid in maintenance of habitat that preserves rare species.  Including its financial and human capital investments in development of the Range-Wide Plan and the O&G CCAA, the State has expended more than $26 million in preservation efforts for the Lesser Prairie-Chicken alone. When candidate species within Oklahoma are moved to the threatened species list, the State

incurs significant regulatory expenses in addition to expenses incurred to avoid a "take" of the species.  In addition, the State will incur costs to enforce regulatory limitations designed to avoid "taking" aquatic species such as the Rabbitsfoot Mussel and the Arkansas Darter.  Perhaps most importantly, the State will lose flexibility in the range of measures Oklahoma may undertake to preserve species without the cumbersome restrictions of a listing under the ESA.

17.     Plaintiff DOMESTIC ENERGY PRODUCERS ALLIANCE is a unique organization with a grassroots approach to domestic onshore energy advocacy and education. DEPA is an alliance of producers, royalty owners, and oilfield service companies as well as state and national independent oil and gas associations representing the small businessmen and women of the energy industry and devoted to both survival of domestic crude oil and natural gas exploration and production and American energy security.  Members of DEPA reside in the Northern District of Oklahoma. DEPA members conduct oil and gas operations in Oklahoma and elsewhere that will be adversely affected if species are moved from the candidate species classification to the ESA's endangered or threatened list.  DEPA and its members have participated, in concert with FWS, the State of Oklahoma, other states and other companies, in the development of the Range-Wide Plan and the O&G CCAA in order to implement conservation measures sufficient to avoid FWS's listing the Lesser Prairie-Chicken as threatened or endangered.  DEPA and its members expect to participate in comparable conservation efforts for other candidate species, including the Sprague's Pipit, whose ranges include the State of Oklahoma.

18.     Defendant DEPARTMENT OF THE INTERIOR ("Interior") is the federal agency charged with administration of much of the ESA including the listing procedures contained in 16 U.S.C. § 1533.

19.     Defendant FISH & WILDLIFE SERVICE ("FWS" or "Service") is a part of Interior that has been delegated the responsibility to implement much of the ESA, including determining the species for which listing under the ESA should be decided and which of these species should be classified as candidate species pursuant to 16 U.S.C. § 1533(b)(3)(B)(iii), (C)(i).

20.     Defendant SALLY JEWELL is the Secretary of Interior, and is sued in her official capacity.  Secretary Jewell, in her capacity as Secretary of Interior, has ultimate responsibility for Interior and FWS's actions under the ESA.

21.     Defendant DANIEL M. ASHE is the Director of FWS and is sued in his official capacity.  Director Ashe oversees FWS, the agency charged with implementing much of the ESA.

22.     Defendant GARY FRAZER is the Assistant Director for Endangered Species at FWS, and is sued in his official capacity.  Assistant Director Frazer oversees the listing function of FWS under the ESA.

23.     Defendant DIXIE PORTER is the Field Supervisor for the Oklahoma Ecological Services Field Office of FWS and is sued in her official capacity.  Ms. Porter has participated in FWS's regulatory efforts for the Lesser Prairie-Chicken and other species.  She supervises FWS implementation of the ESA within the State of Oklahoma.  ("FWS" refers to the Defendants collectively unless otherwise specified.)

## LEGAL FRAMEWORK

### THE ENDANGERED SPECIES ACT

24.     Congress enacted the ESA to provide protections for species that could be at risk for declines in population and, potentially, for extinction.  16 U.S.C. § 1531(b).  Section 4 of the

ESA directs the Service to determine whether a species should be listed as "endangered" or "threatened" based upon five factors.  16 U.S.C. § 1533(a)(1); *see also* 50 C.F.R. §§ 424.10, 424.11(c).

25.     The statute contains various mandates for protection of listed species.  *See* 16 U.S.C. §§ 1532(19), 1533(f), 1536(b)(3)(A), 1538.  Once a species is listed as threatened or endangered, the ESA imposes an express prohibition on "taking" the species where taking means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct."  16 U.S.C. § 1532(19).  Under FWS regulations "harm" can "include significant habitat modification or degradation" where "essential behavioral patterns, including breeding, feeding, or sheltering" are significantly impaired. 40 C.F.R. § 17.3.[3]

26.     Thus, for example, oil and gas operations can allegedly "take" a listed species if the operations merely modify or degrade the habitat of listed species or inadvertently harass a single member of the species.  The cost to the oil and gas industry of avoiding a "take" of a listed species can be enormous and, in some instances, can preclude operations in their entirety.

<u>**The ESA's Listing Procedures**</u>

27.     Any "interested person" may petition the Service to list a species as threatened or endangered.  *See* 16 U.S.C. § 1533(b)(3).  "To the maximum extent practicable," FWS must then determine within 90 days whether the petition presents "substantial scientific or commercial information indicating that the petitioned action may be warranted."  16 U.S.C. § 1533(b)(3)(A).  If the 90-day finding concludes that the petition does not present substantial information indicating that listing may be warranted, the listing process is terminated for that petition.  If the Service makes a positive 90-day finding for a species, it must determine, within twelve months,

---

[3] *See also* Babbitt v. Sweet Home Chapter of Cmtys. for a Great. Or., 515 U.S. 687 (1995).

whether the petitioned action is (i) not warranted, (ii) warranted and a listing is proposed, or (iii) warranted but precluded by other priorities.  *Id.* at 1533(b)(3)(B).

28.     The statute mandates that the Service "***shall***" make its listing determinations,

> ***solely*** on the basis of the ***best scientific and commercial data available*** . . . after conducting a review of the status of the species and ***after taking into account those efforts, if any, being made by any State*** . . . or any political subdivision of a State . . . ***to protect such species***, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction.

16 U.S.C. § 1533(b)(1)(A) (emphasis added).

29.     If the Service's 12-month finding concludes that listing is "warranted" the ESA provides the Service with two options:  (i) issue a proposed listing rule, *id.* at 1533(b)(3)(B)(ii); or (ii) determine, based upon science-driven prioritization, that the listing is "warranted but precluded."  16 U.S.C. §§ 1533(b)(3)(C)(iii), 1533(h)(3).

30.     A species that receives the "warranted but precluded" status is considered a "candidate species" and, annually, the Service must re-evaluate each of these candidate species following the statutory criteria for a 12-month finding:

> A petition with respect to which a [warranted but precluded] finding is made . . . ***shall*** be treated as a petition that is resubmitted . . . under subparagraph (A) on the date of such finding and that presents substantial scientific or commercial information that the petitioned action may be warranted.

16 U.S.C. § 1533(b)(3)(C)(i).  With each annual review of a candidate species, FWS must repeat the very same statutory process, and the statute directs the Service to consider all three alternatives anew.

31.     FWS thus must consider whether:

> The petitioned action is warranted, but that –

> (I) the immediate proposal and timely promulgation of a final regulation implementing the petitioned action . . . *is precluded by pending proposals to determine whether any species is an endangered species or a threatened species*, and

> (II) expeditious progress is being made to add qualified species to either of the [ESA] lists . . . and to remove from such lists species for which the protections of this chapter are no longer necessary . . . .

16 U.S.C. § 1533(b)(3)(B)(iii) (emphasis added).  FWS is required to consider whether it has sufficient resources to meet its obligations for pending candidate species.  Once it knows the agency does not have sufficient resources to propose rules on listing and critical habitat, FWS is required to make a reasoned decision as to which of the candidate species should be brought forward to make a listing decision.

32.     There is no deadline for proposing a rule to list candidate species nor any limit to the time  a species can remain in "candidate" status.  In each annual review after a species is designated as a candidate species, the Service, guided by its evaluation of the five factors specified in the statute and using the "best" data "available," retains the statutory prerogative of determining the species' listing is warranted but precluded by other priorities, and, consequently, the species should remain a candidate species for the following year.  *See* 16 U.S.C. §§ 1533(b)(3)(C)(i), (b)(1).  The Service must also consider efforts to protect the species undertaken by States.  *See* 16 U.S.C. § 1533(b)(1).  FWS cannot eliminate, in its annual reconsideration of a candidate species, the alternative of retaining that species within the candidate species classification.

33.     The Service has promulgated regulations implementing these ESA listing alternatives.  Not surprisingly, FWS's regulations construe the statutory directive for annual

review of candidate species as requiring FWS to consider retaining the species within the

candidate species category:

> (3) Upon making a positive finding under paragraph (b)(1) of this section, the Secretary shall commence a review of the status of the species concerned and ***shall*** make, within 12 months of receipt of such petition, ***one of the following findings***:

> (i) The petitioned action is not warranted, [ ],

> (ii) The petitioned action is warranted, [ ] or

> (iii) The petitioned action is warranted, but that –

> (A) The immediate proposal and timely promulgation of a regulation to implement the petitioned action is precluded because of other pending proposals to list, delist, or reclassify species, and

> (B) Expeditious progress is being made to list, delist, or reclassify qualified species, in which case, such finding shall be promptly published in the Federal Register together with a description and evaluation of the reasons and data on which the finding is based.

> * * *

> (4) If a finding is made under paragraph (b)(3)(iii) of this section with regard to any petition, the Secretary ***shall***, within 12 months of such finding, ***again make one of the findings described in paragraph (b)(3) with regard to such petition***, but no further finding of substantial information will be required.

50 C.F.R. § 424.14(b) (emphasis added).

34.     Thus, the statute mandates that FWS choose among *all three alternatives each year*, based upon the information available at that time.  The language of the statute does not

permit FWS to make a decision based upon speculation as to the future status of a candidate

species.  Nor may FWS rely on old information that has not been updated in the current year.

Rather, FWS must reevaluate the candidate species annually and decide, based upon then

available data and conservation practices, *inter alia*, whether the species should remain as a candidate species.

35.    Throughout the 30-year history of this statutory provision and its regulatory counterpart, FWS has followed a practice of reconsidering each candidate species on an annual basis, while retaining the statutory prerogative of keeping each species as a "candidate species" based upon its respective priority for listing.

## CANDIDATE SPECIES

36.    FWS has described a "candidate species" as a species "for which we have on file sufficient information on biological vulnerability and threats to support a proposal to list as endangered or threatened but for which preparation and publication of a proposal is precluded by higher priority listing actions."  78 Fed. Reg. 70,104 (Nov. 22, 2013).  If a species is determined to be "warranted" for listing but is "precluded by pending proposals" for listing other species under Section 4(b)(3)(C)(iii), the species becomes a "candidate species."  *See* 16 U.S.C. § 1533(b)(3)(C)(iii).

37.    One reason FWS classifies species as candidate species is "to provide information that may stimulate and guide conservation efforts that will remove or reduce threats to these species and possibly make listing unnecessary."  78 Fed. Reg. at 70,104.  According to FWS, its policy is to "*strongly encourage collaborative conservation efforts for candidate species*, and offer technical and financial assistance to facilitate such efforts."  *Id*. at 70,105 (emphasis added).

38.    The candidate species classification benefits both landowners and candidate species because it promotes the implementation of voluntary conservation programs that not only avoid "restrictive land use polices" associated with listed species but also allow "greater

management flexibility to stabilize or restore these [candidate] species and their habitats . . . ."[4] The Service has recognized that, "[i]deally, sufficient threats can be removed to eliminate the need for listing." *Id.* Thus, over time, species which remain in the candidate species classification are given an important opportunity to recover sufficiently and, thereby, justify a finding by FWS that the species are "not warranted" for listing as threatened or endangered.

39.     FWS must act on candidate species in accordance with a priority system mandated by Congress.  In 1979, Congress amended the ESA, adding a new Section 4(h), requiring FWS to adopt "agency guidelines to insure that the purposes of this section are achieved efficiently and effectively," including "a ranking system to assist in the identification of species that should receive priority review for listing." *See* Pub. L. No. 96-159, 93 Stat. 1225, 1226 (1979).  In 1982, Congress elaborated on this mandate, amending Section 4(b)(3)(B) to its current form to require FWS to make one of three substantive determinations for a species: (i) the listing is "not warranted," (ii) listing the species is "warranted" in which case a listing rule will be proposed, or (iii) the listing is warranted but precluded by higher priority pending proposals. *See* ESA § 4(b)(3)(B), 16 U.S.C. § 1533(b)(3)(B).

40.     At the time of the 1982 amendment, Congress recognized the Service's limited resources were insufficient to respond to the increasing numbers of petitions filed by advocacy organizations demanding listing decisions for various species on the statutory schedule dictated by the ESA.  Congress accordingly determined that: "The listing agencies should utilize a *scientifically based priority* system to list and delist species, subspecies and populations based

---

[4] U.S. FISH & WILDLIFE SERVICE, CANDIDATE SPECIES (2011), http://www.fws.gov/endangered/esa-library/pdf/candidate_species.pdf (last visited Mar. 17, 2014).

on the degree of threat, and proceed in an efficient and timely manner." H.R. Rep. No. 97-835 (1982) (Conf. Rep.), *reprinted in* 1982 U.S.C.C.A.N. 2860, 2862 (emphasis added).

41.     The statute directs FWS to adopt a "ranking system to assist in the identification of species that should receive priority review under [ESA §4(a)(1)]." 16 U.S.C. § 1533(h)(3). Under the policy adopted in 1983 to implement this requirement, FWS assigns a priority for action to each species on the candidate list. As the Service noted when it adopted this now thirty-year-old policy, "it is necessary to assign priorities to listing, delisting, reclassification, and recovery actions in order to make the most appropriate use of the limited resources available to implement the [ESA]." 48 Fed. Reg. 43,098 (Sept. 21, 1983). FWS has explained that, in order to assign priorities among candidate species, FWS considers, first, the magnitude of the threats to each candidate species; second, the immediacy of the threat; and third, the taxonomic status of the species. *See* 78 Fed. Reg. 70,104, 70,105 (Nov. 22, 2013). This detailed analysis generates a listing priority number ("LPN") ranging from 1 (highest) to 12 (lowest). The "LPN ranking system provides a basis for making decisions about the relative priority for preparing a proposed rule to list a given species." *Id*.

42.     Since FWS adopted this science-driven priority system in 1983, the number of species that have become the subject of listing petitions, 90-day findings, and 12-month findings has increased dramatically. By 2010, 251 species were on the candidate species list. *See* 75 Fed. Reg. 69,222 (Nov. 10, 2010). Since FWS entered into the settlements described below, one of the settling advocacy organizations has petitioned for listing of more than 400 additional species.

VOLUNTARY CONSERVATION MEASURES

43.     The ESA acknowledges the value of voluntary conservation measures, expressly recognizing that "encouraging the States and other interested parties, through . . . a system of incentives, to develop and maintain conservation programs" is "key" to "safeguarding" species.

16 U.S.C. § 1531(a)(5).  To this end, FWS has encouraged "collaborative" efforts to implement conservation measures and specifically adopted a policy endorsing use of "CCAAs between FWS and states or private parties as a means to "preclude or remove any need to list the covered species." *See* 64 Fed. Reg. 32,726, 32,727 (June 17, 1999).

44.     CCAAs are formal, voluntary agreements between the FWS and non-federal property owners designed to provide incentives to implement conservation measures for declining species.  According to FWS,

> By precluding or removing any need to list a species through early conservation efforts, property owners can maintain land use and development flexibility. In addition, initiating or expanding conservation efforts before a species and its habitat are critically imperiled increases the likelihood that simpler, more cost-effective conservation options will still be available and that conservation will ultimately be successful.

64 Fed. Reg. 32,726, 32,727 (June 17, 1999).

45.     For many years, FWS encouraged landowners and others potentially affected by listing decisions to enter into Candidate Conservation Agreements (including CCAAs) with FWS.  FWS has explained that "[p]articipants voluntarily commit to implement specific actions designed to remove or reduce threats to covered species, so that listing may not be necessary."[5] Thus, FWS recognizes that CCAAs confer a benefit upon landowners, allowing them to commit themselves to conservation measures in order to "preclude or remove any need to list the covered species."  64 Fed. Reg. 32,726, 32,734 (June 17, 1999).

46.     When FWS undertakes its yearly review of candidate species, it considers the then-current scientific data and protective measures adopted by the states and other parties,

---

[5] U.S. FISH & WILDLIFE SERVICE, CANDIDATE CONSERVATION AGREEMENTS (2011), http://www.fws.gov/endangered/esa-library/pdf/CCAs.pdf (last visited Mar. 17, 2014).

including CCAAs.  New data and conservation measures have, in some cases, lowered the priority of species within the candidate species category; in other cases, they have resulted in findings that the candidate species are "not warranted" for listing.  In three decades of prioritizing candidate species, the Service has consistently taken the position that there are no deadlines for making a "warranted" or "not warranted" listing decision for candidate species.

## PROCEDURAL & FACTUAL BACKGROUND

### SETTLEMENTS FOR CANDIDATE SPECIES

47.     In 2010, a multi-district litigation panel consolidated in the U.S. District Court for the District of Columbia twelve actions against FWS seeking various listing decisions from the Service for a variety of species.[6]   Two special interest litigants – WildEarth Guardians and the Center for Biological Diversity – had brought these actions that addressed a portion of the candidate species.

48.     FWS chose not to defend these cases.  Instead, FWS entered into settlement negotiations and, in May 2011, concluded its first settlement with WildEarth Guardians.[7]  The WildEarth Guardians Settlement was not confined to the candidate species at issue in the original WildEarth Guardians complaints.[8]  Rather, FWS agreed to a settlement that swept in *all* of the 251 species within the candidate species classification catalogued in FWS's then most current

---

[6] *See In re* Endangered Species Act Section 4 Deadline Litigation, 716 F.Supp. 2d 1369 (MDL 2010).

[7] *See* Stipulated Settlement Agreement, *In re* Endangered Species Act Section 4 Deadline Litigation, Misc. Action No. 10-377 (EGS) (D.D.C. May 10, 2011) (the "WildEarth Guardians Settlement").

[8] In addition to the candidate species at issue in the litigation, WildEarth Guardians also had cases that addressed nine Texas mollusks, the Utah population of the gila monster, and the Mexican wolf consolidated for purposes of resolving 90-day and 12-month findings.

publication on the subject, the November 10, 2010 Candidate Notice of Review ("CNOR"), 75 Fed. Reg. 69,222 (Nov. 10, 2010).

49.     In the WildEarth Guardians Settlement, FWS agreed to submit either a "warranted" decision along with proposed listing rule or a "not warranted" decision for each of the 251 candidate species on a schedule ending in Fiscal Year 2016.  The WildEarth Guardians Settlement specifies interim numbers of species that must either be proposed or determined to be listed:  130 out of 251 by September 30, 2013, no fewer than 160 out of 251 by September 30, 2014, and no fewer than 200 out of 251 by September 30, 2015.[9]  In addition, the WildEarth Guardians Settlement required that FWS make a series of determinations and propose listings as specified in fiscal years 2011 and 2012.[10]

50.     Under the WildEarth Guardians Settlement, FWS committed to proposing a listing of the Lesser Prairie-Chicken no later than Fiscal Year 2012.[11]  FWS also committed to proposing a listing decision for the Sprague's Pipit and for the Arkansas Darter by not later than September 30, 2016.[12]  FWS also agreed to propose a listing decision for two other Oklahoma candidate species by September 30, 2016, the Neosho Mucket Mussel and the Rabbitsfoot Mussel.  FWS has already proceeded to final decisions for both of these Oklahoma species, listing the Neosho Mucket as endangered and the Rabbitsfoot as threatened.  78 Fed. Reg. 57,076 (Sept. 17, 2013).  FWS listed the Rabbitsfoot Mussel over the express objections of the State of

---

[9] WildEarth Guardians Settlement at ¶ 6.

[10] *Id.* at ¶ 1, Exh. B.

[11] *Id.* Exh. B at 4.

[12] *Id.* at ¶ 2.

Oklahoma Department of Wildlife Conservation, which noted in comments to FWS that listing was premature and could interfere with conservation efforts, and urged FWS to retain the Rabbitsfoot mussel's classification as a candidate species.  FWS declined to do so (or even to defer action until September 30, 2016), citing *inter alia* the mandates of the WildEarth Guardians Settlement.  *Id.*at 57,078-79.

51.     FWS also committed that, for each of the 251 candidate species, the Service would ***not*** consider the alternative otherwise available under the ESA:  to retain the candidate species classification beyond the WildEarth Guardians Settlement-imposed deadline for a listing decision.  This commitment is enforceable regardless of any scientific data, any change in priority for a species, or the effect of conservation measures that might provide ample justification for FWS to retain the candidate species classification for such species.

52.     Similarly, for the candidate species listed on Exhibit B, the WildEarth Guardians Settlement imposes a two-year schedule for listing decisions and prohibits the Service from retaining the species in the candidate species classification beyond the specified date.  Thus, under this settlement, the Lesser Prairie-Chicken was subject to a listing proposal in Fiscal Year 2012 regardless of whether the Lesser Prairie-Chicken would have a lower priority vis-à-vis other species by virtue of conservation measures (including CCAAs), scientific data, or other available data that would otherwise merit retention of the Lesser Prairie-Chicken's classification as a candidate species.  Similarly, the Sprague's Pipit would be subject to a listing proposal by not later than the end of Fiscal Year 2016, regardless of whether the species would have a lower priority vis-à-vis other species by virtue of conservation measures, scientific data, or other available data that would otherwise merit retention of the Sprague's Pipit's classification as a candidate species beyond 2016.

53.     On July 12, 2011, the Service entered into a settlement with the other special interest plaintiff, Center for Biological Diversity.[13]  In this settlement, the Service similarly committed itself to submit a proposed listing rule or a "not warranted" finding for 39 additional species within specified fiscal years for a period extending from 2011 to 2017.  (Collectively, the WildEarth Guardians Settlement and the CBD Settlement are referred to as the "Settlements").

54.     In the CBD Settlement, FWS committed that, for each of these additional 39 species, the Service would *not* consider the alternative available under the ESA to retain the candidate species classification regardless of then-available scientific data, any change in priority for a species, or conservation measures that might otherwise be the basis to retain the candidate species classification under the ESA.

55.     At the time FWS entered into the Settlements, the agency knew or should have known it would not have the resources to make listing decisions in accordance with its statutory duty to use the best scientific and commercial data available for all of the hundreds of species subject to the Settlements.  Indeed, FWS has never made so large a number of listing decisions in so short a time.  FWS knew or should have known that, for many of the species scheduled for a "warranted" or "not warranted" decision under the Settlements, the agency simply would not have the resources to make decisions, propose the requisite listing rules, and keep up with its other listing obligations.  Indeed, FWS should have recognized at the time that the number of species slated for such decisions would overwhelm the resources available for listing.

---

[13] *See* Stipulated Settlement Agreement, *In re* Endangered Species Act Section 4 Deadline Litigation, Misc. Action No. 10-377 (EGS) (D.D.C. July 12, 2011) (the "CBD Settlement").

56. FWS therefore knew or should have known that, for many of the hundreds of species for which it obligated itself to make decisions, the "proposal and timely promulgation of a final regulation implementing the petitioned [listing] action" would be "precluded by pending proposals." 16 U.S.C. § 1533(b)(3)(B)(iii)(1). FWS knew or should have known that, to follow the dictates of the statute, the agency is *required* to prioritize candidate species and to retain some of these species within the candidate classification.

57. In its listing program, FWS places its highest priority on "[c]ompliance with court orders and court-approved settlement agreements requiring that petition findings or listing or critical habitat determinations be completed by a specific date." 78 Fed. Reg. 49,422, 49,436 (Aug. 14, 2013). Consequently, FWS will comply with the Settlements' arbitrary deadlines even if newly available scientific or commercial data demonstrate that, due to its relatively low priority, a species should properly remain within the candidate species classification for a time period exceeding the deadlines imposed by the Settlements.

58. Not only did FWS decline to defend the litigation giving rise to these Settlements, but when two other parties attempted to intervene to challenge features of the Settlements, FWS mounted vigorous objection, maintaining that the parties did not have cognizable interests in the litigation and the court should deny intervention. The court adopted the government position, rejecting, on procedural grounds, any participation by entities that had not been a party to the litigation.[14]

---

[14] *See In re* Endangered Species Action Section 4 Deadline Litigation, 270 F.R.D. 1 (D.D.C. 2010) (rejecting proposed intervention from Tejon Ranch Company concerning the Tehachapi Slender Salamander); *In re* Endangered Species Action Section 4 Deadline Litigation, 277 F.R.D. 1 (D.D.C. 2011) (rejecting intervention regarding Lesser Prairie-Chicken, New England Cottontail, and Greater Sage Grouse); *see also In re* Endangered Species Action Section 4 Deadline Litigation, 704 F.3d 972 (D.C. Cir. 2013) (affirming rejection of intervention).

59.     Despite its claim that the Settlements would reduce the volume of listing deadline litigation, FWS continues to receive many new petitions including a single petition from CBD, the special interest litigant responsible for the CBD Settlement, to list 404 species. The Service has acknowledged these new petitions will "significantly increas[e]" the number of listing and critical habitat actions "with absolute statutory deadlines."  78 Fed. Reg. 49,436 (Aug. 14, 2013). FWS distinctly does not have the resources to engage in a listing evaluation for all of the species subject to the Settlements, and many of them clearly should be retained as candidate species. Nevertheless, even if, as measured by FWS's  longstanding guidance for prioritizing species, some of the candidate species at issue in this litigation would have a relatively low priority, FWS will make a listing decision on species subject to the Settlements *before* it will consider other, higher-priority species.

60.     In sum, the Settlements require, for 290 candidate species, most of which were *not* even the subject of the consolidated litigation, that FWS (i) eliminate continuation of the ESA-authorized candidate species classification regardless of the applicable science, conservation measures, or priority; (ii) decide, for each of these species, either that listing is "not warranted," or that listing is "warranted" and a listing rule must be proposed; and (iii) abide by a lockstep schedule to make these listing decisions through late 2017.  FWS denied the public an opportunity to participate in this regulatory decision; FWS never proposed a change to existing regulations that require FWS to consider retaining the candidate species classification.  Iinstead, FWS was quick to oppose any participation by affected entities in the litigation that spawned the Settlements.  Therefore, the Plaintiffs have never had an opportunity to participate in the decision that gave rise to FWS's disregard of its statutorily-imposed obligations and radical departure from its decades-old policy for candidate species.

## THE OKLAHOMA SPECIES

61.     Among the species that are the subject of the 2011 Settlements are five species believed to inhabit Oklahoma.  The Service has already proposed moving the Lesser Prairie-Chicken from the candidate species category to a "threatened" listing. The Sprague's Pipit (*Anthus spragueii*) and the Arkansas Darter (*Etheostoma cragini*) are currently candidate species, but FWS plans to move them from the candidate species list no later than 2016 in accordance with the Settlements.  FWS has already listed two species previously classified as candidate species:  the Neosho Mucket Mussel (*Lampsilis rafinesqueana*) has been listed as "endangered," and the Rabbitsfoot Mussel (*Quadrula cylindrica*) has been listed as "threatened."

62.     The State of Oklahoma stands to be injured when decisions are made with respect to any of these species whose listings are pending pursuant to the Settlements (just as the State already suffered injury from the Settlements when FWS acted precipitously to list the Rabbitsfoot Mussel without considering ongoing conservation strategies).  In addition, listing any of the Oklahoma Candidate Species increases the regulatory burden on the State of Oklahoma and will narrow the State's flexibility with regard to regulating habitat.  For the Rabbitsfoot Mussel, the listing has already made it more cumbersome for the State to transplant the species among watersheds to help conserve this mussel.  Similarly, listing other species under the Act impedes and conflicts with Oklahoma's regulation of at-risk species under State law.

63.     Pursuant to applicable law, the State has maintained authority and jurisdiction over waters of the State.  The State has exclusive authority to oversee the appropriation of water rights and has primacy for implementation of the Clean Water Act within Oklahoma. Designation of some of these species, including the Rabbitsfoot Mussel or the Arkansas Darter, could lead to demands that State agencies adjust water appropriations and modify water discharge permits to accommodate listed species.  Designation of such species will also interfere

with land use planning conducted by State and local governments.  Moreover, requirements attendant to a listing would impede the State's ability to allow and regulate recreational activities, such as fishing or boating, on waters within Oklahoma.

64.     DEPA members have operations that are within the range of some of the Oklahoma Candidate Species.  If any of these species is listed under the ESA, DEPA members will incur significant costs either to avoid entirely a "take" of the species, or, alternatively, to obtain and comply with incidental take or enhancement of survival permits under the ESA.  *See generally* 16 U.S.C. §§ 1538, 1539.  In addition, DEPA members have many operations that require federal approvals, and the agency providing the authorization must "consult" with FWS and take various steps to assure that the operations at issue do not "jeopardize" the listed species. *See* 16 U.S.C. § 1536.  Thus, DEPA members stand to suffer significant harm from the Service's new policy, founded on capitulation to special interest groups, that departs from the ESA and from the Service's regulation implementing the ESA.  Specifically, candidate species, including the Rabbitsfoot Musssel, the Lesser Prairie-Chicken and the Sprague's Pipit, that would otherwise have sufficiently low priorities and that, consistent with FWS listing practices for the past three decades, would have remained within the candidate species category, will now be listed as threatened or endangered.

A.     **The Rabbitsfoot Mussel**

65.     On September 17, 2013, FWS listed the Rabbitsfoot Mussel as "threatened," removing it from the candidate species list even sooner than the September 30, 2016, deadline for doing so under the Settlement Agreements.  FWS had placed the Rabbitsfoot Mussel on the candidate species list in 2009 and assigned it an LPN of 9.  74 Fed. Reg. 57,804, 57,877 (Nov. 9, 2009).  The Rabbitsfoot Mussel was thus among the 251 candidate species that FWS agreed to rush to judgment before the 2016 deadline.  Indeed, FWS proposed the Rabbitsfoot Mussel for

listing in 2012.  77 Fed. Reg. 63,440 (Oct. 16, 2012).  The Oklahoma Department of Wildlife

Conservation (the "ODWC") filed comments opposing the listing of the Rabbitsfoot Mussel,

stating:

> We believe that such a listing would be premature and may impede
> potential efforts to augment declining populations or to re-establish
> populations in watersheds where this species has become
> extirpated . . . [Since 2009], the Rabbitsfoot had been assigned a
> moderate to low listing priority of 9.  We find the rapid elevation
> of the Rabbitsfoot from a candidate species with a listing priority
> of 9 to a proposed threatened species to be premature. . . .  Each of
> the 51 remaining water courses that support[s] Rabbitsfoot
> populations represents an opportunity for enhancement or
> augmentation that could improve the species' overall stability and
> viability.   And the longevity of the mussel provides us with a
> window of opportunity to develop and implement a conservation
> strategy that could preclude the need for listing. . . .  A deferment
> of the listing action would facilitate the implementation of
> coordinated and purposeful reintroduction where these
> opportunities exist.  If listing takes place prior to these restoration
> efforts, the permitting process will be more cumbersome and
> obtaining local public support will likely be more difficult. . . . We
> believe that the development and implementation of these
> conservation strategies and the recruitment of conservation
> partners will proceed more effectively if they are conducted in the
> context of proactive conservation rather than in the context of
> recovering a species that is already listed.

Comments of ODWC (Dec. 17, 2012).  FWS rejected ODWC's recommendation, citing the

mandate of the Settlements and the need to make progress toward the September 30, 2016,

deadline.  78 Fed. Reg. at 57,078-79.  FWS was not willing to await the outcome of conservation

efforts for this species because it believes it is handcuffed by the Settlements.  The listing of the

Rabbitsfoot Mussel over the objections of ODWC demonstrates that, unless restrained, FWS will

unlawfully follow the same course of action for the other Oklahoma Species.

**B.       The Lesser Prairie-Chicken**

66.       On June 9, 1998, the Service determined that listing of the Lesser Prairie-Chicken under the ESA was "warranted but precluded" by other higher priority actions and classified the Lesser Prairie-Chicken as a candidate species.  63 Fed. Reg. 31,400 (June 9, 1998).

67.       In December 2008, the priority of the Lesser Prairie-Chicken was changed so that, under the FWS 12-point scale, the Lesser Prairie-Chicken had a higher priority.  73 Fed. Reg. 7517 (Dec. 10, 2008).  According to FWS, this change was due to a "change in the magnitude of the threats from development of wind energy and associated placement of transmission lines throughout the estimated occupied range of the Lesser Prairie-Chicken." *See* 77 Fed. Reg. 73,827, 73,830 (Dec. 11, 2012).

68.       The Bureau of Land Management has entered into a Candidate Conservation Agreement with FWS designed to conserve the Lesser Prairie-Chicken.  In addition, FWS entered into "umbrella" CCAAs for the Lesser Prairie-Chicken in New Mexico, Texas, and Oklahoma.  Under these agreements, the participants implement certain conservation measures that are anticipated to reduce threats to the Lesser Prairie-Chicken and improve population stability.  On March 1, 2012, the New Mexico State Land Office enrolled all conserved Lesser Prairie-Chicken habitat on State Trust lands into these agreements.  Other actions taken by New Mexico, private interests, and the Bureau of Land Management have conferred conservation benefits on Lesser Prairie-Chicken habitat in New Mexico.  The Texas Parks and Wildlife Department holds a permit under an agricultural CCAA and has enrolled landowners who volunteer to implement management plans for the Lesser Prairie-Chicken in Texas.  ODWC's CCAA for the Lesser Prairie-Chicken covers agricultural activities on non-federal lands in 14 Oklahoma counties.

69.     WildEarth Guardians brought suit against FWS seeking a listing of the Lesser Prairie-Chicken in 2010 in the U.S. District Court for the District of Colorado.  This action was consolidated with other listing actions in the District Court for the District of Columbia.[15]  The WildEarth Guardians Settlement dictates a listing deadline by FY 2012; FWS is not allowed, under this settlement, to consider retaining the Lesser Prairie-Chicken as a candidate species notwithstanding recent, robust conservation efforts and data that might otherwisesupport FWS's assigning the Lesser Prairie-Chicken a high LPN (i.e., a lower priority for conservation in comparison to other candidate species).

70.     Pursuant to the WildEarth Guardians Settlement, in December 2012, the Service proposed to list the Lesser Prairie-Chicken as threatened throughout its range.  77 Fed. Reg. 73,828 (Dec. 11, 2012).  The Service did not consider the potential to continue the classification of the Lesser Prairie-Chicken as a candidate species.  Nor did the Service re-evaluate the priority of the Lesser Prairie-Chicken, based upon current science and conservation measures, to discern whether the Lesser Prairie-Chicken's priority might have declined as against other candidate species.

71.     Had FWS inquired, it would have discovered a number of relevant developments that might well have led the Service to conclude that the Lesser Prairie-Chicken's status had changed and that this species' priority, vis-à-vis other species, was now so low that the Lesser Prairie-Chicken should have remained a candidate species.  Among the subjects that FWS should have considered in assessing whether the Lesser Prairie-Chicken should remain as a candidate species are:

---

[15] *See In re* Endangered Species Act Section 4 Deadline Litigation, No. 10-377 (EGS), MDL Docket No. 2165 (D.D.C.).

a.      evidence that the range of the Lesser Prairie-Chicken is expanding;

b.      evidence that the population of the Lesser Prairie-Chicken is stabilizing and may be increasing;

c.      the Range-Wide Plan and the O&G CCAA;

d.      practices adopted by the Oklahoma Wildlife Conservation Commission in a Memorandum of Agreement with the Oklahoma Independent Petroleum Association under the State of Oklahoma's CCAA;

e.      the Candidate Conservation Agreement with the Bureau of Land Management;

f.      the umbrella CCAAs for private lands in New Mexico, Oklahoma, and Texas; and

g.      the status of wind projects and power line construction and also recent conservation efforts made by the wind industry.

72.     In its proposed listing rule for the Lesser Prairie-Chicken, FWS summarized 43 existing conservation measures but unlawfully declined to consider these in connection with its decision to remove the Lesser Prairie-Chicken from the candidate species classification.

73.     On May 6, 2013, the Service proposed a special rule, 78 Fed. Reg. 26,302 (May 6, 2013), under section 4(d) of the ESA, 16 U.S.C. § 1533(d), that would allow for take of the Lesser Prairie-Chicken incidental to activities conducted pursuant to a Service-approved comprehensive conservation program developed by or in coordination with a state agency.  The rule also proposed authorizing take incidental to agricultural activities included in a conservation plan developed by the Natural Resources Conservation Service ("NRCS") for private agricultural lands in connection with the NRCS's Lesser Prairie-Chicken Initiative.  More recently, on December 11, 2013, the Service published a revised proposed 4(d) special rule and reopened the public comment period for the 4(d) special rule and the listing proposal.

74.     Following FWS policies designed to conserve candidate species and thereby retain flexibility that is unavailable for a listed species, the State of Oklahoma, working with four

other states, a DEPA member company and a number of other energy companies facilitated development of the FWS-endorsed Range-Wide Plan and O&G CCAA.  A DEPA member company later became the first company to enroll in the Range-Wide Plan, which FWS approved several months before FWS approved the O&G CCAA.

75.    On February 28, 2014, FWS signed the O&G CCAA describing the agreement as "the result of longstanding cooperation between [FWS] and the five range states of the lesser prairie-chicken – Texas, Oklahoma, Kansas, Colorado, and New Mexico – to undertake conservation action for the species . . . ."[16]

76.    To approve a CCAA, FWS "must determine" that the CCAA, if implemented on necessary properties, "would preclude or remove any need to list the covered species."  64 Fed. Reg. 32,726, 32,734 (June 17, 1999).  Even though FWS has now found that the O&G CCAA could remove any need for listing the Lesser Prairie-Chicken, the agency, having foregone its ability to retain the Lesser Prairie-Chicken in the candidate species category, continues to take steps to list the species.  Despite ongoing implementation of both the Range-Wide Plan and the O&G CCAA as complementary conservation strategies capable of providing a net conservation benefit for the Lesser Prairie-Chicken, the Service has said it will issue its final listing determination for the Lesser Prairie-Chicken no later than March 31, 2014.

C.    **The Sprague's Pipit**

77.    In 2010, FWS determined that listing the Sprague's Pipit as endangered or threatened under the ESA was "warranted but precluded" by other higher priority actions.

---

[16] Press Release, U.S. Fish & Wildlife Service, Service Finalizes Range-wide Conservation Agreement to Aid Lesser Prairie-Chicken on Oil and Gas Lands (Feb. 28, 2014), http://www.fws.gov/coloradoes/Lesser_prairie_chicken/NR_LPC_CCAA_Corrections_030314_v2.pdf (last visited Mar. 17, 2014).

Accordingly, the Service classified the Sprague's Pipit as a candidate species.  75 Fed. Reg. 56,028 (Sept. 15, 2010).  FWS's determination was in response to a petition from WildEarth Guardians seeking listing of the Sprague's Pipit.  *Id.*  The Service initially assigned a priority of 2 to the Sprague's Pipit under the FWS 12-point scale, noting among other things that the "suitable habitat declined . . . to 1.55 to 1.86 percent of the historical breeding habitat in the United States . . . remaining in large enough patches to support nesting territories."  *Id.* at 56,041.

78.     However, in 2012 FWS revised the LPN for the Sprague's Pipit, assigning an LPN of 8 to the species – a substantially lower priority.  The Service explained that:

> While habitat loss has occurred and will likely to continue to occur (sic), . . . approximately 15 to 18 percent of the breeding range remains in suitable habitat cover and in large enough patch sizes to support nesting, and population decline seems to have slowed in recent years. . . .  Therefore, we have assigned the Sprague's pipit an LPN of 8.

*See* 77 Fed. Reg. 69,993, 70,015 (Nov. 21, 2012) (emphasis added).  Thus, in a span of only two years, the Service adjusted upward by a full order of magnitude its assessment of the available habitat for the Sprague's Pipit.  FWS's decision to update its 2010 assessment of the remaining habitat both significantly lowered the priority for action on the Sprague's Pipit and demonstrates that retaining a species within the candidate species classification while scientific knowledge and conservation measures progress can lead to a dramatic re-evaluation of the urgency of action for that species.  The Sprague's Pipit continues to have a low-priority LPN of 8 on FWS's most recent CNOR.  *See* 78 Fed. Reg. 70,120 (Nov. 22, 2013).  Yet, notwithstanding this low priority, FWS, by entering into the Settlements, has compelled itself to remove this species from the candidate species classification by 2016 – even if then-current data would suggest that the species should remain a candidate species.

### D.     The Arkansas Darter

79.     In 2010 FWS revisited, for the last time prior to embarking on "timetable"

decision-making, the reasons why the Arkansas darter had been a candidate species for a number

of years, with a very low-priority LPN of 11.  FWS noted that factors influencing the extent of

this fish in a number of Western states, including Oklahoma, include groundwater irrigation

withdrawals that cause decreased flows in streams where the Arkansas darter lives, as well as

water quality degradation from various sources.  75 Fed. Reg. 69,222, 69,251 (Nov. 10, 2010).

However, FWS observed, there was no reason to rush to make a listing decision for the species:

> The magnitude of threats facing this species is moderate to low,
> given the number of different locations where the species occurs
> and the fact that no single threat or combination of threats affects
> more than a portion of the widespread population occurrences.
> Overall, the threats are nonimminent since groundwater pumping
> is declining and development, spills, and runoff are not currently
> affecting the species range-wide.  Thus, we are retaining an LPN
> of 11 for the Arkansas darter.

*Id*. at 69251-52.  Nevertheless, in the Settlements FWS committed to forego any continuation of

the Arkansas darter as a candidate species after 2016, regardless of the merits of continuing to do

so.

### CLAIMS FOR RELIEF

### Count I
### Violation of the APA and ESA:
### Elimination of the ESA's "Warranted but Precluded" Alternative

80.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1

through 79 of this Complaint, as though fully set forth below.

81.     The ESA requires that, upon receiving a petition for listing a species as threatened

or endangered, the Secretary must make a preliminary finding as to whether that petition

"presents substantial scientific or commercial information indicating that the petitioned action

*may* be warranted."  16 U.S.C. § 1533(b)(3)(A) (ESA § 4) (emphasis added); 50 C.F.R. § 424.14(b).

82.    If the Secretary concludes that listing *may* be warranted, the Secretary must review the status of the species and, within 12 months, make one of the following *three* findings:

a.    The petitioned action is not warranted;

b.    The petitioned action is warranted and listing is proposed; or

c.    The petitioned action is warranted, but the immediate proposal and timely promulgation of a final regulation implementing the petitioned action is precluded by pending proposals.

*See* 16 U.S.C. § 1533 (b)(3)(B); *see also* 50 C.F.R. § 424.14(b).

83.    Where FWS determines that listing for a species is "warranted but precluded," the Service must revisit that decision annually. *Id.*

84.    Neither the statute nor FWS's regulations limit the time that a particular species can remain as a "candidate species," and FWS itself has formally taken the position that there is no time limit on its ability to declare annually that a species should remain a "candidate species."

85.    By entering into the Settlements, FWS has agreed, without the benefit of either statutory amendment or administrative rulemaking procedures, to eliminate one of the statutorily mandated alternatives for categorizing species that are the subject of a listing petition:  FWS has agreed to eliminate the possibility of retaining the "candidate species" classification for these species.

86.    FWS, in evaluating the potential listing of the Rabbitsfoot Mussel and the Lesser Prairie-Chicken, chose between two options:  proposing to list the species or eliminating it from listing consideration altogether.  Similarly, when FWS evaluates the Arkansas Darter and the Sprague's Pipit under the Settlement schedule, its choices will be limited either to proposing a

listing or to declining to list the species – FWS will <u>not</u> consider keeping the species in the candidate species category.

87.     FWS's agreement to eliminate one of the statutorily mandated alternative findings violates the ESA as well as FWS's own regulations, and, therefore, is not in accordance with law and must be set aside under 5 U.S.C. § 706(2).

**Count II**
**Violation of the APA and ESA:  Failure to Consider**
**<u>Best Scientific and Commercial Data and Conservation Practices</u>**

88.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 87 of this Complaint, as though fully set forth below.

89.     Section 4(b)(1)(A) of the ESA requires that the Secretary "shall make determinations" as to listing

> *solely* on the basis of the *best scientific and commercial data* available to [her] after conducting a review of the status of the species *and after taking into account those efforts, if any, being made by any State . . . to protect such species . . . by . . . conservation practices, within any area under its jurisdiction . . . .*

16 U.S.C. § 1533(b)(1)(A) (emphasis added).

90.     Under FWS's regulations, the Service must decide whether to list a species "*solely* on the basis of the best available scientific and commercial information regarding a species' status."  50 C.F.R. § 424.11(b) (emphasis added).  The Service must "take into account, in making [listing] determinations . . . those efforts, if any, being made by any State . . . to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction . . . ."  50 C.F.R. § 424.11(f).

91.     FWS can decide,

on the basis of the best scientific and commercial data available after conducting a review of the species' status, that the species is endangered or threatened because of any one or a combination of the following factors: (i) [t]he present or threatened destruction, modification, or curtailment of its habitat or range; (ii) [o]verutilization for commercial, recreational, scientific, or educational purposes; (iii) [d]isease or predation; (iv) [t]he inadequacy of existing regulatory mechanisms; or (v) [o]ther natural or manmade factors affecting its continued existence.

50 C.F.R. § 424.11(c).

92.     By virtue of its obligations under the Settlements, FWS has committed itself to make its final listing decision on the Lesser Prairie-Chicken by March 31, 2014.  *See* U.S. FWS "Endangered and Threatened Wildlife and Plants; 6-Month Extension of Final Determination for the Proposed Listing of the Lesser Prairie-Chicken as a Threatened Species," 78 Fed. Reg. 41,022, 41,023 (July 2013).

93.     Oklahoma and other states, together with DEPA members and other stakeholders, have developed and designed conservation practices, including the Range-Wide Plan and the O&G CCAA, in order to eliminate any need to list the Lesser Prairie-Chicken as threatened or endangered.  The State has also implemented conservation measures for the other Oklahoma Candidate Species.

94.     Because FWS did not sufficiently review and analyze scientific data and conservation practices prior to committing to remove the Lesser Prairie-Chicken and the Rabbitsfoot Mussel from the candidate species category and prior to proposing to list the species pursuant to the arbitrary and aggressive deadlines to which FWS agreed in the Settlements, FWS violated the ESA.  FWS's commitments to the Settlements' timetables for the Sprague's Pipit and the Arkansas Darter, regardless of then-current data and conservation measures, also violate

the ESA.  Therefore, FWS's listing decisions and commitments for the Oklahoma Candidate Species  are contrary to law and must be set aside under 5 U.S.C. § 706(2).

### Count III
### Violation of the APA and ESA:
### <u>Failure to Comply With ESA Section 4(h) Guidelines</u>

95.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 94 of this Complaint, as though fully set forth below.

96.     The ESA mandates that FWS "shall" establish guidelines "to insure that the purposes of [ESA § 4] are achieved efficiently and effectively." 16 U.S.C. § 1533(h).  Among the purposes of ESA § 4 is the requirement, as codified in FWS regulations, that the Service make its listing decisions based upon the "best scientific and commercial data available" as well as state conservation practices.  This mandate extends to all aspects of listing including the Service's decision to remove a species from the candidate species classification.

97.     Congress mandated a particular practice to implement efficient and effective science-driven listing decisions:  ESA Section 4(h) requires that the "Secretary shall establish, and publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively.  Such guidelines shall include, but are not limited to - . . . (3) a ranking system to assist in the identification of species that should receive priority review under subsection (a)(1) of this section[.]" 16 U.S.C. § 1533(h).

98.     FWS promulgated such guidelines, revising and publishing them in the Federal Register in 1983, and has applied them since that time in addressing the relative priority of species for listing.  *See* U.S. FWS, "Endangered and Threatened Species Listing and Recovery Priority Guidelines," 48 Fed. Reg. 43,098, 43,102 (1983).

99.     With respect to the Rabbitsfoot Mussel, the Lesser Prairie-Chicken and the other Oklahoma Candidate Species subject to the Settlements, however, FWS has deviated from the ESA requirements and the guidance that FWS adopted thereunder by committing in advance to specified deadlines for addressing candidate species, thereby (i) ignoring the priorities among the existing candidate species, (ii) eliminating consideration of the relative priorities of species that are the subject of subsequent petitions, and (iii) obligating the Service to conduct perfunctory listing determinations for candidate species.

100.     Thus, FWS's actions are unlawful and should be set aside pursuant to 5 U.S.C. § 706(2).

## Count IV
## <u>Violation of the APA: Rulemaking Without the Requisite Legal Process</u>

101.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 100 of this Complaint, as though fully set forth below.

102.     Under 16 U.S.C. § 1533(b)(4), FWS's promulgation or amendment of rules implementing the ESA must comply with the rulemaking provisions of the Administrative Procedure Act, set forth in 5 U.S.C. § 553.

103.     Under the APA, FWS can adopt or amend its rules only if it (a) publishes notice of the proposed action in the Federal Register, (b) gives interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments, (c) considers all such comments before adopting the rule or amendment, and (d) incorporates in the rule a concise general statement of its basis and purpose. 5 U.S.C. § 553(c).  Moreover, FWS's compliance with all of these requirements must be evident and transparent to the public and to a reviewing court in a proper administrative record.

104.    "Rulemaking" as defined in 5 U.S.C. § 551(5) "means agency process for formulating, amending, or repealing a rule."  FWS's commitment in the Settlements to truncate its decision-making process constitutes rulemaking because it nullifies key parts of FWS's regulations for listing decisions as applied to almost 300 species, including *all* of the species then classified as "candidate" species.

105.    Where FWS makes a preliminary finding that listing may be warranted, the regulations require it to further review the species' status and make one of three findings:

    (i)     The petitioned action is not warranted or

    (ii)    the petitioned action is warranted, in which case the Secretary shall promptly publish in the Federal Register a proposed regulation to list the species or

    (iii)   The petitioned action is warranted, but that—

        (A)    The immediate proposal and timely promulgation of a regulation to implement the petitioned action is precluded because of other pending proposals to list, delist, or reclassify species, and

        (B) Expeditious progress is being made to list, delist, or reclassify [other] qualified species.

50 C.F.R. § 424.14(b).

106.    FWS's agreement to the Settlements unlawfully amends its regulations by imposing mandatory deadlines for removing *all* of the 2010 candidate species from the candidate species classification.  Essentially, FWS has, through its Settlements, amended its regulations to eliminate the candidate species classification, without regard for science, conservation measures, or any other criteria that might support keeping the species within the candidate species classification.

107.    The Settlements required that FWS either propose the Lesser Prairie-Chicken for listing or remove it from consideration with a "not warranted" finding in FY 2012.  FWS thereby

bound itself not to retain the Lesser Prairie-Chicken's classification as a candidate species.  FWS made the same commitment to remove the Rabbitsfoot Mussel, the Sprague's Pipit, and the Arkansas Darter from the candidate species classification no later than September 30, 2016. Beyond the specified deadlines, the Settlements do not allow FWS to consider classifying these species as "warranted but precluded" by higher-priority decisions for other species.  Eliminating one of the regulatory options for all of the candidate species is an unlawful attempt to impart substantive changes to the regulations without the requisite rulemaking procedures or, at the very least, a clear violation of these regulations.

108.    The Court should set aside FWS's decision not to consider continued retention of the Oklahoma Candidate Species as candidate species beyond the deadlines in the Settlements as contrary to section 706 of the APA because that decision constitutes rulemaking "without observance of procedure required by law."  FWS effectively amended its regulations without publishing notice in the Federal Register, without giving the public an opportunity to comment, and without providing a statement of basis and purpose.  Alternatively, FWS's commitment in the Settlements to ignore its regulations as applied to the Oklahoma Candidate Species is blatantly "not in accordance with law," and for that further reason this Court should set aside these commitments under the APA.

### Count V
### Violation of the Due Process Clause of
### the Fifth Amendment to the United States Constitution

109.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 108 of this Complaint, as though fully set forth below.

110.    In the Settlements, FWS agreed that it would determine whether listing the candidate species would be "warranted" or "not warranted" without consideration for the

potential that these species could, under the terms of the statute, retain their classification as "candidate species" due to conservation measures, new data, or simply their low priority as compared to other species.

111.     FWS has committed itself, in court-enforceable Settlements, to forego a statutory alternative for *all* of the 2010 candidate species.  As applied to the Oklahoma Candidate Species, FWS committed to a decision that injures the Plaintiffs without consulting them or even considering the impact on DEPA members and the State of Oklahoma of a decision to list candidate species located in Oklahoma.

112.     For the Rabbitsfoot Mussel and the Lesser Prairie-Chicken, FWS has already rejected, pursuant to the Settlements' terms, the alternative of retaining the candidate species classification.  For the Lesser Prairie-Chicken, the Plaintiffs, in conjunction with the other four states and other stakeholders, invested significant sums in their effort to adopt conservation measures that, if considered on their merits, could forestall the listing.  Similarly, for the Rabbitsfoot Mussel, the State was in the midst of implementing a series of conservation measures when FWS decided not to retain this species' candidate species status.  By committing itself to a process that explicitly negates the terms of the statute, FWS and its collaborators effectively destroy the potential that efforts and investments by Plaintiffs and others could improve the viability of candidate species and thereby avoid the hardships posed by an ESA listing.

113.     The Supreme Court has long-recognized that settlements cannot bind non-participating third parties.[17]  At least one court has already recognized that the Settlements

---

[17] *See, e.g.*, Martin v. Wilks, 490 U.S. 755, 759 (1989) (citing "general rule that a person cannot be deprived of his legal rights in a proceeding to which he is not a party");  Local No. 93 (Continued...)

should not prevent assertion of ESA claims in a different court.  In *Western Watersheds Project v. U.S. Fish & Wildlife Serv.*,[18] the Court noted that it would be "unjust" to "bind [the plaintiff] to [the Settlements] it never signed."[19]

114.    Yet, FWS claims the Settlements bind the State and the regulated community to terms procured without their participation.  The government did not contest the special interest litigants' desire to eliminate the candidate species category.  The Plaintiffs here had no opportunity to contest FWS's decision to eliminate this statutory alternative for the Oklahoma Candidate Species.

115.    The due process clause of the Fifth Amendment to the Constitution forbids government practices and policies that violate precepts of fundamental fairness.  Here, FWS's decision to forego a specific statutory provision, to the detriment of Plaintiffs, denies Plaintiffs due process and is fundamentally unfair to Plaintiffs.

116.    Because the Settlements purport to abrogate the rights of Plaintiffs, the application of the Settlements to the Oklahoma Candidate Species violates due process.[20]   As applied to the Oklahoma Candidate Species, Defendants' agreement to forego considering the merits of retaining these species within the classification of candidate species, without the participation of affected parties – including the Plaintiffs in this action – violates due process.

---

v. City of Cleveland, 478 U.S. 501, 528 (1986) ("[O]f course, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party.").

[18] No. 4:10-CV-229-BLW, 2012 WL 369168 (D. Idaho Feb. 2, 2012).

[19] *Id.* at *10.

[20] *See* Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 327 n. 7 (1979) ("It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard."); *accord* Sanguine, Ltd. v. U.S. Dep't of Interior, 798 F.2d 389, 392 (10th Cir. 1986).

117.     This Court should declare that, as applied to all of the Oklahoma Candidate Species, FWS has violated the due process clause of the Constitution in its agreement to bind states and the regulated community, including Plaintiffs in this action, to a process that does away with a statutory alternative under the ESA.

118.     This Court should further (i) declare that the obligations FWS undertook in the Settlements with respect to the Oklahoma Candidate Species are null and void, (ii) vacate any regulatory action, including any ESA listing FWS has proposed or completed pursuant to the Settlements, and (iii) direct Defendants to consider annually, for each of the Oklahoma Candidate Species, *all three* of the alternatives Congress provided in the ESA, including the potential for the species to continue as a candidate species under the ESA's statutory criteria.

## Count VI
## Violation of Article II  of the United States Constitution

119.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 118 of this Complaint, as though fully set forth below.

120.     The executive branch is obligated by Article II, Section 1 of the Constitution to execute laws enacted by Congress.

121.     In the ESA, Congress specified that, for candidate species, on an annual basis, FWS "shall" make one of three findings.  Despite this Congressional mandate, the Service refuses to implement this provision having committed itself, in a court-enforceable settlement, *not* to consider the third category prescribed by Congress.  16 U.S.C. § 1533(b)(3)(B)(iii).  The Settlements eliminate, for *all* of the candidate species identified by FWS as of 2010, the statutory category that Congress required in 16 U.S.C. § 1533(b)(3)(C)(iii).

122.     The executive branch has ceded to the special interest plaintiffs, who are empowered by the Settlements to enforce provisions of the Settlements, its authority to decide

which species should remain candidate species.  As a result, the special interest litigants may dictate, via enforcement of their settlement agreements, the removal of species from the candidate species classification.

123.    This Court should declare that, as applied to the Oklahoma Candidate Species, FWS has exceeded executive branch authority under the Constitution in its decision to bind the executive branch to a settlement that transfers authority away from the executive branch to special interest litigants, contrary to Article II of the Constitution.

124.    This Court should further (i) declare that the obligations FWS undertook in the Settlements with respect to the Oklahoma Candidate Species are null and void, (ii) vacate any regulatory action, including any ESA listing FWS has proposed or completed pursuant to the Settlements, and (iii) direct Defendants to carry out the constitutional duties of the executive branch and consider annually, for each of the Oklahoma Candidate Species, *all three* of the alternatives Congress provided in the ESA, including the potential for the species to continue as a candidate species under the ESA's statutory criteria.

## PRAYER FOR RELIEF

Plaintiffs the State of Oklahoma and DEPA respectfully request that this Court enter judgment in their favor, and:

1.    Declare that FWS has violated the ESA, its implementing regulations, the APA, and the Constitution by eliminating, from among the alternatives prescribed  by 16 U.S.C. § 1533(b)(3)(B), the ability to retain the candidate species classification for Oklahoma Candidate Species;

2.      Declare that FWS has violated the ESA and APA by failing to consider available data and conservation measures as required by Section 4(b)(1)(A) of the ESA, 16 U.S.C. § 1533(b)(1), and ESA regulations at 50 C.F.R. § 424.11;

3.      Declare that FWS violated the ESA and APA in failing to comply with its own Section 4(h) guidelines;

4.      Declare that FWS's actions in violation of the ESA, and its implementing regulations and guidelines thereunder, must be set aside and vacated as "not in accordance with law," under Section 706 of the APA;

5.      Declare that FWS's elimination of the candidate species alternative is an unlawful rulemaking without required legal process in violation of the APA;

6.      As applied to the Oklahoma Candidate Species, declare that FWS's actions in purporting to impose the results of the Settlements on non-parties to those Settlements, including the public and the Plaintiffs, and to adopt, via the Settlements, policies extending well beyond the purview of the litigation leading to the Settlements, violate the Due Process Clause of the Fifth Amendment to the Constitution;

7.      As applied to the Oklahoma Candidate Species, declare that FWS has exceeded executive branch authority under Article II of the Constitution in its decision to bind the executive branch to the special interest litigants' Settlements, thereby abdicating executive branch authority to decide, based upon an ESA-required annual evaluation, whether a species should retain its candidate species classification;

8.      Vacate and remand to FWS any FWS decision to propose a listing of any of the Oklahoma Candidate Species as threatened or endangered under the ESA, and any decision to list an Oklahoma Candidate Species as threatened or endangered under the ESA;

9.      Enjoin any decision for any other Oklahoma Candidate Species that would exclude from consideration the potential for determining that one or more of these species should remain a candidate species; and

10.     Grant Plaintiffs such other relief as may be necessary and appropriate or as the Court deems just and proper.

Dated:  March 17, 2014

Respectfully submitted,

_s/Gerald L. Hilsher_
Gerald L. Hilsher, OBA #4218
Robert J. Joyce, OBA #12728
Jessica John Bowman, OBA #30388
McAFEE & TAFT
A Professional Corporation
1717 S. Boulder Ave., Suite 900
Tulsa, Oklahoma 74119
(918) 587-0000 - Telephone
(918) 599-9317 - Facsimile
gerald.hilsher@mcafeetaft.com
robert.joyce@mcafeetaft.com
jessica.johnbowman@mcafeetaft.com

John C. Martin
Duane A. Siler
Susan M. Mathiascheck
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500
(202) 628-5116
(_pro hac vice_ motions to be submitted)

David D. Freudenthal
205 Storey Blvd.
Cheyenne, WY  82009
(307) 996-1401
CROWELL & MORING LLP
(_pro hac vice_ motion to be submitted)

_s/E. Scott Pruitt_
E. Scott Pruitt
Attorney General
Patrick R. Wyrick
Solicitor General
P. Clayton Eubanks
Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK  73105
patrick.wyrick@oag.ok.gov
clayton.eubanks@oag.ok.gov

ATTORNEYS FOR PLAINTIFF STATE OF OKLAHOMA

jmartin@crowell.com
dsiler@crowell.com
smathiascheck@crowell.com
dfreudenthal@crowell.com

ATTORNEYS FOR PLAINTIFF
THE DOMESTIC ENERGY
PRODUCERS ALLIANCE